# United States Court of Appeals
## For the First Circuit

---

No. 09-1703

BARBARA GENT,

Plaintiff, Appellant,

v.

CUNA MUTUAL INSURANCE SOCIETY,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

---

Before

Boudin, Circuit Judge
Souter,[*] Associate Justice,
and Howard, Circuit Judge.

---

Jonathan M. Feigenbaum with whom Phillips & Angley, was on brief, for appellant.
Peter E. Pederson, with whom Daniel K. Ryan, Marissa I. Delinks and Hinshaw & Culbertson LLP, were on brief, for appellee.

---

July 12, 2010

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**HOWARD**, <u>**Circuit Judge**</u>.  This case arose after CUNA Mutual Insurance Society ("CUNA") stopped paying long-term disability benefits to the appellant, Barbara Gent.  CUNA ceased its payments after determining that Gent was subject to the "mental illness limitation" in its policy.  Under this limitation, an insured who is disabled due to a mental illness may not receive disability benefits for more than two years.  Gent took several administrative appeals of CUNA's determination, arguing that her disability was caused by a physical condition, specifically, Lyme disease.  When these appeals were unsuccessful, Gent filed this action in federal district court under ERISA[1], claiming that CUNA had unlawfully terminated her benefits.  After reviewing the administrative record, the district court granted summary judgment to CUNA.  The court held that the policy's mental illness limitation applied because Gent had failed to prove that her disability was caused by Lyme disease.  This appeal ensued.

Gent's primary argument is that the district court erroneously required her to prove that her disability stemmed from a physical condition.  In her view, the burden was on CUNA to prove that she was disabled due to a mental illness and thus subject to the mental illness limitation. We think that, regardless of who bore the burden, CUNA's evidence is stronger and so affirm.

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101-1461.

-2-

# I. Facts

## A. The policy

At all relevant times, Gent was employed by the Westerly Community Credit Union as the Vice President of Operations. As a benefit of her employment, Gent was covered under the Credit Union's long-term disability insurance plan. Plan benefits are paid under a long-term disability insurance policy issued by CUNA. CUNA also administers this ERISA-governed plan.

Three aspects of CUNA's policy bear mentioning. First, CUNA's policy provides that it will pay an insured monthly benefits if the insured is "Disabled due to Sickness or Injury." Under the terms of the policy, an insured is "totally disabled" if (among other things) an injury or sickness prevents her from performing "all of the material and substantial duties of [her] occupation on a full-time basis because of a disability." Second, although CUNA's policy defines sickness as an illness or disease, the policy also contains a mental illness limitation. This limitation states that an insured who is disabled due to a mental illness may receive a maximum of two years of disability benefits. Finally, CUNA's policy requires an insured who is seeking benefits to submit a proof of claim that must include "the date the disability started; the cause of disability; and the degree of disability."

B.  The 2000 claim

In March 2000, work-related stress led Gent to see a therapist.  During her session with the therapist, Gent expressed fears that the new president at the Westerly Community Credit Union was trying to take responsibilities away from her and to "get me out of there."  Shortly thereafter, Gent met with her psychiatrist, Dr. A.H. Parmentier.  She informed Dr. Parmentier that work-related stress had caused her to become depressed.  In addition to depression, Gent complained of "anxiety, sleep disturbance, poor energy, difficulty focusing, crying spells, and [the] 'inability to think clearly.'"  After evaluating Gent, Dr. Parmentier diagnosed her with recurrent major depression and excused her from work.  In his evaluation, Dr. Parmentier observed that Gent had a history of depression.  In 1988 she had been hospitalized for depression triggered by work-related stress.

In June 2000, Gent submitted a claim for long-term benefits under her policy.  Filed along with her claim was a required attending physician statement.  This statement, completed by Dr. Parmentier, listed recurrent major depressive disorder as the diagnosis.  Dr. Parmentier further indicated that Gent had a "Class 4" mental impairment, which meant that she was "unable to engage in stress situations or engage in interpersonal relations (marked limitations)."  No cardiac or physical impairments were identified by Dr. Parmentier.

In August 2000, CUNA approved Gent's claim for disability benefits. In the approval letter mailed to Gent, CUNA prominently excerpted the mental illness limitation.

    C.  <u>The administrative appeals and current lawsuit</u>

In April 2002, CUNA sent Gent a letter informing her that, because of the mental illness limitation, her benefits would end in July 2002. When CUNA stopped paying benefits in July 2002, Gent appealed, claiming that the two-year mental-illness cap on benefits did not apply to her because her disability now stemmed from a physical condition, specifically Lyme disease. According to Gent, approximately one year after CUNA started paying her monthly disability benefits (roughly June 2001) a tick bit her, infecting her with Lyme disease. CUNA asked Dr. Scott Yarosh, a psychiatrist, to review Gent's medical records. After review of these records, Dr. Yarosh concluded that Gent was "psychiatrically impaired" and that the "medical records as a whole do not document specific criteria to suggest that there are other disabling medical conditions." CUNA denied Gent's appeal.

From November 2002 to March 2006, Gent appealed the adverse benefits determination five more times. Throughout the appeals process, both Gent and CUNA supplemented the administrative record with medical opinions from various doctors. These doctors came to divergent conclusions, with some opining that Gent was disabled by Lyme disease and others that Gent, if disabled, was

disabled by a depressive disorder.[2] CUNA rejected four of these five appeals, declining to consider her fifth, the sixth overall, on administrative exhaustion grounds.

In June 2006, Gent filed this lawsuit in federal district court. In due course, both she and CUNA moved for summary judgment. As already noted, the district court granted summary judgment to CUNA, upholding the termination of disability benefits.

## II.  Standards of Review

We review a district court's grant of summary judgment de novo. Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 516 (1st Cir. 2005). When deciding whether a party is entitled to summary judgment, we typically view the record evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Leahy v. Raytheon Co., 315 F.3d 11, 16-17 (1st Cir. 2002). Our approach is different, however, in the ERISA benefit-denial context, where the record before us is the same record that was before the plan administrator. Orndorf, 404 F.3d at 517. In such a case, "summary judgment is simply a vehicle

_____

[2] A report from one of these experts, Dr. Daniel A. Kinderlehrer, is the subject of a dispute between the parties. The report was included with Gent's final administrative appeal, which CUNA declined to consider. Gent asserts that the district court erred when it ignored the report. We assume for the sake of argument that the court erred and consider the report here.

-6-

for deciding the [benefits] issue" and "the non-moving party is not entitled to the usual inferences in its favor." Id.[3]

What level of deference we must give to the plan administrator's benefits determination is a separate issue. Where, as here, the plan does not give the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, our review of the administrator's decision is de novo. Denmark v. Liberty Life Assur. Co., 566 F.3d 1, 5-6 (1st Cir. 2009). Under this standard, "[w]e grant no deference to the administrators' opinions or conclusions." Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010).

### III.  Discussion

Gent argues that the district court erred when it saddled her with the burden of proving that Lyme disease rendered her disabled under the terms of the policy.[4] In her view, the mental illness limitation operates as would a coverage exclusion under traditional insurance law principles. Under those principles, once an insured has met her initial burden of proving that a claim falls

___

[3] In Leahy, we explained that, "In an ERISA benefit denial case, trial is usually not an option:  in a very real sense, the district court sits more as an appellate tribunal than as a trial court."  315 F.3d at 17-18.

[4] Gent may have waived this argument, as she raised it for the first time in her motion to reconsider. See CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1526 (1st Cir. 1996).  We overlook any waiver here.

within the grant of coverage, the burden shifts to the insurer to show that an exclusion defeats coverage. See McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred and the insurer must prove facts that bring a loss within an exclusionary clause of the policy."); see also Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113, 131 (1st Cir. 2004); GRE Ins. Group v. Metro. Boston Hous. P'ship, Inc., 61 F.3d 79, 81 (1st Cir. 1995) (describing how exclusions operate under Massachusetts law).

Facially, the limitation might appear to operate much like an exclusion. The parties agreed that Gent was disabled and was entitled to benefits whether the cause was psychological or physical, and CUNA then tried to cut off those payments by pointing to a time limit on payments for those disabled by mental illness rather than by a physical cause. On the other hand, the policy, which listed the mental illness limitation under the heading "Benefits," required that the insured provide proof of "Disability due to sickness or injury" that includes "the cause of disability." One could argue that these provisions put the burden on Gent to establish the physical or organic etiology of her disability in order for her to be eligible to continue receiving benefits after two years.

Be we need not pursue this issue. At least where, as here, the burden of proof is the preponderance of the evidence standard, how the burden is allocated does not much matter unless one or both parties fail to produce evidence, or the evidence presented by the two sides is in "perfect equipoise." LPP Mortg., LTD. v. Sugarman, 565 F.3d 28, 33 (1st Cir. 2009). Both Gent and CUNA produced copious albeit conflicting evidence, and we do not think it perfectly balanced. Our view is that CUNA's evidence is stronger than Gent's evidence, and thus CUNA would prevail, whether it bore the burden of proof or not.

Some background is in order. Lyme disease is caused by a specific bacterium, "Borrelia burgdorferi," which normally lives in mice, squirrels and other small animals.[5] It is transmitted to humans through the bites of particular kinds of ticks. Typically, the first sign of infection is a circular rash called an "erythema

---

[5] This information is taken primarily from the website of the Center for Disease Control and Prevention ("CDC"), a U.S. federal agency under the Department of Health and Human Services. See CDC, Lyme Disease, http://www.cdc.gov/ ncidod/ dvbid/lyme/index.htm (last visited June 23, 2010). It is unclear to what extent the information on the CDC's website is formally part of the record. Although the district court and the parties have cited to the CDC website as authoritative, it appears that Dr. Kinderlehrer's report is the only piece of record evidence that references the CDC directly. This is unproblematic, as other evidence in the record conveys most of the information that can be found on the CDC's website. Nevertheless, to be on the safe side, we take judicial notice of the relevant facts provided on the website, which are "not subject to reasonable dispute." Fed. R. Evid. 201(b), (f); see also Denius v. Dunlap, 330 F.3d 919, 926-27 (7th Cir. 2003) (taking judicial notice of information from official government website).

-9-

migrans," which appears at the bite site. This rash can, but need not, take the form of a bulls-eye. Along with the rash, some patients also experience symptoms of "fatigue, chills, fever, headache, and muscle and joint aches, and swollen lymph nodes." If not treated, the infection may spread to other parts of the body and cause the following symptoms: loss of facial muscle tone, neck stiffness, severe headaches, shooting pains that may interrupt sleep, heart palpitations and dizziness. If further left untreated, the infection will cause approximately sixty percent of patients to suffer severe joint pain and swelling along with bouts of arthritis. Months to years after an untreated infection, five percent of patients may also develop "chronic neurological complaints," including "shooting pains, numbness or tingling in the hands or feet, and problems with concentration and short term memory."

Lyme disease is diagnosed based primarily on clinical evidence, i.e., "symptoms, objective physical findings (such as erythema migrans, facial palsy, or arthritis), and a history of possible exposure to infected ticks." Further laboratory testing can be very helpful in diagnosing the disease. Among the useful laboratory tests are blood tests which measure the presence of Lyme antibodies in the patient's blood. When testing blood for these antibodies, the CDC recommends that doctors follow a two-step process. First, doctors should administer an "ELISA or IFA" test.

-10-

If the ELISA test is positive, doctors should administer a "Western blot test."  This test will typically be positive only if a patient has Lyme disease.  According to the CDC, "[i]f the Western blot is negative, it suggests that the first test was a false positive, which can occur for several reasons."

We return the specifics of this case.  In June 2001, Gent reported an insect bite to a primary care physician, Dr. Lori Drumm.  Gent had large red rings on both arms.[6]  Dr. Drumm referred Gent to Dr. Wendy Clough, an infectious disease specialist.  During her appointment, Gent complained of "[s]ignificant fatigue, 10-lb. weight gain; hearing problems; dry cough, sinus pain, episodes of chest pain and shortness of breath; [and] palpitations."  Gent also reported experiencing "achy joints over a year ago" and her medical history revealed disrupted sleep patterns, headaches, and lightheadedness.  In June 2004, during an appointment with a different doctor, Gent complained of fatigue, weakness, dizziness, and "abnormal sensation of the right body."

From June 2001 to September 2003, Gent underwent a battery of testing intended to help determine whether she had Lyme disease.  First, her blood was tested.  Consistent with the two-step process outlined by the CDC, an ELISA test was conducted in

_____

[6] It is unclear from the physician notes whether Dr. Drumm personally observed the large red rings or whether Gent merely reported the rings to Dr. Drumm.  We will assume for the sake of analysis that Dr. Drumm observed the rings.

June 2001. This test was positive, and a few months later a Western blot test was conducted. The Western blot was negative for Lyme disease. Next, in late September 2001, Gent's cerebro-spinal fluid ("CSF") was tested. Analysis of the CSF revealed no antibodies associated with the disease. Following these tests, Gent's brain and brain functioning were analyzed for signs of a Lyme infection. A December 2002 SPECT scan[7] of Gent's brain disclosed "nonspecific perfusion defects that may be related to Lyme disease." Later neuropsychological testing of Gent's brain functioning yielded inconsistent results. For example, testing conducted in January 2003 revealed deficits in Gent's attention span and rates of learning. Nevertheless, during a neuropsychological examination conducted in September of that year, Gent demonstrated normal attention, concentration, and mental stamina and showed "scattered deficits in some areas of higher cognitive functioning . . . consistent with a functional disorder rather than with Lyme disease."

Doctors reviewing this clinical and laboratory data arrived at different conclusions. Among the doctors in the Lyme disease camp were Dr. Clough, Dr. Samuel Donta (a professor of medicine, infectious diseases, and biomolecular medicine at Boston University School of Medicine), Dr. Robert Porter (board certified

---

[7] The acronym stands for "brain single-photon emission computed tomograph scan."

-12-

in occupational medicine), and Dr. Kinderlehrer (a holistic physician). Although these doctors relied in part on the positive ELISA test when reaching their conclusions, they focused primarily on the clinical symptoms manifested by Gent. Dr. Clough reasoned that "[m]ost of [Gent's] symptoms are not found with a patient who is simply depressed" and that "[m]any of those symptoms . . . are very typical for Lyme disease." Similarly, Dr. Donta concluded that Gent "has severe cognitive problems along with other symptoms that could fit the picture of Lyme disease." Dr. Kinderlehrer echoed these sentiments, observing that Gent "had a tick bite followed by an erythema migrans rash [and] developed neurological, cardiac, and musculoskeletal complaints consistent with Lyme disease . . . ."

Other doctors, however, concluded that Gent did not have Lyme disease. These doctors included Dr. Yarosh, Dr. Mark Moyer (a board certified specialist in internal medicine and infectious diseases), Dr. Christopher Tolsdorf (a clinical neuropsychologist), Dr. John Brusch (board certified in infectious diseases and Chief of Medicine at Youville Hospital in Cambridge, Massachusetts), and Dr. Jeffrey Greene (a clinical professor of medicine at the New York University School of Medicine and Chief of the Tisch Hospital Infectious Disease Section). These doctors focused largely on the laboratory data, including the absence of a positive Western blot test and the fact that Gent's CSF revealed no antibodies associated

with Lyme.  Both Dr. Brusch and Dr. Greene further concluded that the clinical evidence also counseled against a Lyme disease diagnosis.  Dr. Greene observed that many of the symptoms Gent experienced were out of step with the normal progression of Lyme disease.  He said that, in the normal course, the erythema migrans surfaces during the early stages of Lyme disease, whereas certain neurological and joint-related symptoms manifest themselves later. Dr. Greene then observed that Gent had complained of achy joints over a year before any rash surfaced.  This clinical course, according to Dr. Greene, was "very atypical."[8]  For his part, Dr. Brusch said that the "clinical picture of her symptoms" reflected "untreated depression."  In particular, he observed that "the neuropsychological testing is consistent with depression much more than with an organic brain syndrome."

Taking all the evidence into account, we believe CUNA's arguments that Gent's disability was not caused by Lyme disease to be the better-supported position.  Although this conclusion is based on a holistic review of the record evidence, two aspects of this case are worth highlighting.

First, while one can reasonably interpret the clinical and neuropsychological evidence to either support or undermine a Lyme disease diagnosis (as demonstrated by the opinions of the

_____

[8] Dr. Greene did not rule out the possibility that Gent had contracted Lyme disease at some point in her life.  Nevertheless, he said that she did not currently have Lyme disease.

-14-

doctors above), the laboratory data lines up almost uniformly against such a diagnosis. In particular, the Western blot test was negative. Gent's attempts to downplay the significance of the negative Western blot are not persuasive. She points out that the CDC says that where a patient has an erythema migrans, as Gent claimed to have had[9], validated laboratory tests like Western blot are "not generally recommended." But the CDC goes on to say that, even in such cases, "[v]alidated laboratory tests can be very helpful." Whether recommended or not, doctors administered the Western blot test in Gent's case and it was negative. Gent further argues that a few doctors, including Dr. Greene, conceded that no negative test could be completely diagnostic or definitive. Although this may be true, the negative Western blot in Gent's case was corroborated by the analysis of Gent's CSF. Indeed, the only laboratory test which was positive for Lyme diseases was the ELISA test, a test which can produce false positives.[10]

Second, Gent's history of depression makes the Lyme disease diagnosis more susceptible to questioning. Before claiming

_____

[9] Gent claims that she had erythema migrans on both of her arms. Yet, according to the information on the CDC website, an erythema migrans surfaces at the site of the tick bite. Thus, a tick or ticks would have needed to bite Gent on both arms at approximately the same time.

[10] The SPECT scan was inconclusive. Although Dr. Donta said the scan revealed defects that could be consistent with Lyme disease, another doctor, Dr. Greene, said the scan revealed "non-specific" findings.

disability due to Lyme disease, Gent had filed (and CUNA had approved) a disability claim based on recurrent major depressive disorder. Symptoms of this disorder (including fatigue, difficulty concentrating, and sleep disturbance) overlap with symptoms of Lyme disease. Dr. Brusch observed as much in his evaluation of Gent, explaining that, in his view, Gent was suffering from untreated depression, not Lyme disease.

One loose end remains. Gent argues that the district court should have granted her summary judgment because the mental illness limitation in CUNA's policy is ambiguous. The policy defines mental illness as a "[m]ental, nervous or emotional disease[] or disorder[] of any type." According to Gent, the mental illness limitation is ambiguous because it is unclear whether the limitation caps benefits for all illnesses that may produce psychiatric symptoms, including those illnesses with an organic or physical origin (e.g., Alzheimer's Disease or brain cancer). In support of her argument, Gent notes that other circuits have concluded that similarly phrased mental illness limitations are ambiguous. These circuits have construed the limitations in favor of the insured and held that the limitations are inapplicable to illnesses that are physically or organically based, even if those illnesses happen to produce psychiatric symptoms. See Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 538 (9th Cir. 1990)("[M]ental illness refers to a behavioral

disturbance with no demonstrable organic or physical basis . . . . It stems from reaction to environmental conditions as distinguished from organic causes.") (citation omitted); see also Billings v. Unum Life Ins. Co. of Am., 459 F.3d 1088, 1093-94 (11th Cir. 2006); Patterson v. Hughes Aircraft Co., 11 F.3d 948, 950 (9th Cir. 1993); Phillips v. Lincoln Nat'l Life Ins. Co., 978 F.2d 302, 310-11 (7th Cir. 1992).

Even if we were to conclude that the mental illness limitation is ambiguous and construe it in Gent's favor, the question of whether Gent's disability had a physical or organic etiology would still remain. In our view, the evidence does not establish her claim that her illness was caused by Lyme disease (or by additional suspects Meniere's disease and drug toxicity).[11]

### IV. Conclusion

For the reasons provided, the judgment below is **affirmed**.

---

[11] Gent does not argue that the mental illness limitation is inapplicable to her depressive disorder.