# United States Court of Appeals
## For the First Circuit

No. 11-1372

ANTHONY J. SCIBELLI, Executor of the Estate of Walter Jajuga;
ESTATE OF WALTER JAJUGA; KRISTIN A. JAJUGA-MONTEITH; VINCENT M.
JAJUGA; ANTHONY C. JAJUGA,

Plaintiffs, Appellants,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

Terrence A. Low, with whom Law Office of Terrence A. Low was
on brief, for appellants.
Patrick C. DiCarlo, with whom Alston & Bird LLP, Joseph F.
Ryan, and Lyne Woodworth & Evarts LLP were on brief, for appellee.

January 11, 2012

**LYNCH**, **Chief Judge**.  This is one of those rare ERISA denial of benefits cases in which the plan administrator, The Prudential Life Insurance Company of America, did not reserve to itself discretion as to interpretation and administration of its plan.  The benefits at issue are the proceeds of a group life insurance policy (Group Policy) in the sum of $300,000, claimed by the estate of Walter Jajuga, who died on December 31, 2008.  Whether the estate gets those benefits turns on whether Jajuga was "totally disabled" on May 6, 1997, when he stopped working for Mercedes-Benz USA (MBUSA).  If he was so disabled, then he was entitled to continuing coverage under the policy even though he was no longer working for MBUSA.

After a series of mishaps by Prudential in its administration of the claim, and despite Prudential's having agreed Jajuga was totally disabled for purposes of a separate individual life insurance policy (Individual Policy) Jajuga held and Prudential administered, Prudential denied Jajuga's claim under the Group Policy initially and throughout his administrative appeals.

The plaintiffs -- the Estate of Walter Jajuga, Anthony Scibelli as the executor of the estate, and the beneficiaries of the Group Policy: Kristin Ann Jajuga-Monteith, Anthony Charles Jajuga, and Vincent Michael Jajuga -- sued Prudential in federal district court in January 2010, seeking benefits pursuant to 29 U.S.C. § 1132.  The parties filed cross-motions for summary

judgment, and the district court entered summary judgment for Prudential.  See Estate of Jajuga v. Prudential Ins. Co. of Am., No. 10-cv-30016, 2011 WL 798162 (D. Mass. Mar. 1, 2011).

Our review of Prudential's decision is de novo, as is our review of the district court's decision.  Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 82-83 (1st Cir. 2010).  On de novo review, we conclude the plaintiffs are entitled to the benefits.

I.

A.      The medical evidence in the administrative record

Jajuga worked for MBUSA from 1982 until 1997, first holding the position of National Business Management Manager, then a regional management position, and his position for the last year was classified as "special assignments."  The last day he worked was May 5, 1997, and he was then fifty-two years old.  From May 6, 1997, until his death on December 31, 2008, Jajuga never returned to work at MBUSA or anywhere else.

On May 13, 1997, a few days after leaving work, Jajuga had an MRI scan of his cervical and lumbar spine.  A consultation report by Dr. Claude Borowsky written on April 17, 2002, describes the results of the scan:

> I have reports [on the MRI scan of May 13, 1997] which state the existence on the cervical spine of multi-level cervical spondylosis, moderate foraminal and lateral recess encroachment at C6-7, greater on the right than on the left and bulging discs at C5-6 and C6-7 with a disc herniation at C3-4. His MRI of the lumbar spine showed

-3-

degenerative disc changes throughout the lumbar spine with especially advanced disc space collapse at L3-4. Bulging discs were noted at L3-4 and L5-S1. There was a disc herniation at L4-5. There was mild-to-moderate central canal narrowing at L3-4 and L4-5, moderate lateral recess narrowing at L3-4 and L4-5 and foraminal stenosis at L3-4 through L5-S1 bilaterally.

On May 24, 1997, Jajuga was admitted for psychiatric hospitalization at the Valley Hospital in New Jersey for alcohol detoxification and depression. A Valley Hospital social worker wrote in Jajuga's progress report of May 26, 1997: "Has not been to work in approx. 3 1/2 weeks due to back pain [and] is in [the] process of obtaining disability papers so he can receive short-term disability from employer. He is unsure about his future employment at Mercedes."

Jajuga was discharged from his psychiatric care at the Valley Hospital on June 11, 1997. Dr. David Semar, the discharging physician, recorded a psychiatric diagnosis.[1] Dr. Semar also wrote up the following discharge plan: "The patient will continue with

_____

[1] Dr. Semar's diagnosis was on the five axes, or dimensions, relating to the different aspects of psychiatric disorder or disability:
Axis I [clinical disorders] - Depression, not otherwise specified, alcohol dependence.
Axis II [personality disorders] - Personality disorder, not otherwise specified.
Axis III [acute medical conditions and physical disorders] - Chronic pain syndrome.
Axis IV [psychological and environmental factors] - Stressors, severe, chronic pain.
Axis V [global assessment of functioning scale] - GAF 20/50.

-4-

outpatient treatment with Dr. Francis [a psychiatrist] and attend rehabilitation at Silver Hill. The patient will continue with AA. He will continue with medical follow-up with Dr. Scham and return to work as soon as possible. Diet will be regular. Activities will be normal." Jajuga did not return to work; he continued to see medical specialists and sought long-term disability benefits in 1997 and then the waiver of premiums at issue in 1998.

A neurologist, Dr. Patricia Klein, completed two "attending physician statements" as part of Jajuga's applications for disability benefits.[2] On October 23, 1997, Dr. Klein completed an attending physician statement form in support of Jajuga's application for long-term disability benefits from MBUSA. On the form, Dr. Klein provided diagnoses, by code, of cauda equina syndrome, cervical disc disease with myelopathy, and spinal stenosis of the lumbar region. In the field for "subjective symptoms," she wrote "weakness" and "bladder and bowel incontinence." And in the field labeled "objective findings," she wrote "MRI 5/13/97." As to Jajuga's physical impairment, Dr. Klein checked the box for "Class 5 - Severe limitation of functional capacity; incapable of minimum (sedentary) activity (75-100%)." In

_____

[2] There is contradictory information in the administrative record as to how long Dr. Klein had been treating Jajuga. One of the attending physician statements gives the date of Jajuga's first visit with Dr. Klein as August 4, 1997, while a form completed by Jajuga in April 1998 states that he had been treated by Dr. Klein since 1989.

response to the question, "Is patient now TOTALLY disabled?" Dr. Klein checked "yes" boxes for "patient's occupation" and for "any other work." Dr. Klein also stated on the form that Jajuga was incapable of performing all duties, that he would never recover, and that he was not a candidate for rehabilitation. As recounted later, MBUSA found this evidence of disability adequate, allowed Jajuga's claim, and paid long-term disability benefits from at least October 1, 1997, until his death. Further, Prudential found that Jajuga met the conditions for waiver of premiums under his Individual Policy.

Later, on March 30, 1998, Dr. Klein completed a separate "attending physician's statement" form, this one in support of Jajuga's claim for the waiver of premiums under the Group Policy at issue here. On the form, Dr. Klein stated that Jajuga had stopped working due to "numbness in both legs [and] severe pain [in his] low back [and] legs" and "[a]cute [l]umbar [d]erangement." She wrote that the usual duration of the condition was "[i]ndefinite." In response to the question, "What work duties can employee perform?" she wrote "None;" and as to the question, "What duties can employee not perform?" she wrote "All." The report also stated that no changes would allow Jajuga to work at his own job or any other job and that he could not work while receiving treatment because he could not sit.

For reasons attributable to Prudential and in violation of ERISA regulations, the report of the MRI of May 13, 1997, the records related to Jajuga's hospitalization for detoxification and depression, and the attending physician statements of Dr. Klein comprise the only evidence in the administrative record of Jajuga's medical condition roughly in the same period as when he stopped working in May of 1997. The administrative record contains a more detailed picture of Jajuga's health from 2002 until his death on December 31, 2008.

B.      Disability definitions in the relevant policies and statute

Jajuga was enrolled in his employer's group life insurance policy. The Group Policy was insured and administered by Prudential and regulated by ERISA. Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. Jajuga was also a participant in a long-term disability (LTD) benefits plan that was self-insured and administered by MBUSA, and he had purchased an individual life insurance policy from Prudential. He apparently paid his Individual Policy premiums until he sought and obtained a waiver of premiums.

After he stopped working on May 6, 1997, Jajuga eventually applied to Prudential for a waiver of premiums on both his Individual Policy and his Group Policy.[3] Under the Individual

---

[3] The Group Policy contract does not mention a "waiver of premiums" as such. Instead, the Group Policy provides for an

-7-

Policy, premiums are waived for two years if the insured "cannot, due to sickness or injury, do any of the duties of his or her regular occupation." Thereafter, premiums are waived if "he or she cannot, due to sickness or injury, do any gainful work for which he or she is reasonably fitted by education, training, or experience."

Similarly, the Group Policy defines "total disability" for the purpose of that policy's premium waiver clause as follows:

> Total Disability: You are "Totally Disabled" when:
>
> (1) You are not working at any job for wage or profit; and
>
> (2) Due to Sickness, Injury or both, you are not able to perform for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience.

Prudential does not argue any ground for Jajuga's not recovering Group Life coverage and benefits other than its assertion that he was not eligible for a premium waiver because he was not "totally disabled."

Jajuga also applied for and received disability benefits under Social Security Disability Insurance (SSDI) and under the MBUSA LTD plan. The statute governing SSDI benefits provides for

_____

"extended death benefit during total disability": continuing coverage while an individual is totally disabled if such person became totally disabled while a "covered person." However, throughout the administrative appeals process and this litigation, both parties have referred to this "extended death benefit during total disability" provision as a waiver of premiums, so we will as well.

"a disability insurance benefit" to an individual who satisfies various criteria and "is under a disability." 42 U.S.C. § 423(a)(1). The statute defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). The statute goes on to state that

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

The MBUSA LTD plan treats the receipt of SSDI benefits as evidence of total disability entitling a covered person to LTD benefits.

Jajuga received benefits from Social Security under SSDI and from MBUSA under the LTD plan. In addition, Prudential granted Jajuga a waiver of premiums under his Individual Policy, but Prudential denied his claim for a waiver of premiums under the Group Policy.

C.            Prudential's administration of the Group Policy claim

On September 10, 1998, MBUSA forwarded Prudential a claim for a waiver of premiums under the Group Policy on behalf of Jajuga.[4] Among the forms sent was Dr. Klein's March 30, 1998, attending physician's statement. Over a year later, on November 29, 1999, Prudential sent a letter stating that it had reviewed Jajuga's claim, but it sent the letter only to MBUSA and not to Jajuga as well, as required by the applicable regulations. The letter to MBUSA purports to state the conditions for qualifying as "totally disabled" under the Group Policy, but the definition of "totally disabled" set forth in the letter is worded differently from that in the Group Policy at issue in this case.[5] The letter then states: "Based on the medical information in our file, your education and your work experience you do not meet the definition of Total Disability as defined by the Group policy, we are denying

_____

[4] Jajuga submitted his claim for a waiver of premiums under the Group Policy on Prudential's "Group Life Insurance Claim For Total Disability Benefits" form. That form required Jajuga to fill out one side and to return the form, along with an "Attending Physician's Statement of Disability," to the Group Policyholder, in this case MBUSA. An MBUSA employee filled out the other side and submitted the form and the attending physician statement to Prudential.

Even though MBUSA submitted the claim on Jajuga's behalf, the form makes clear that Jajuga was the claimant.

[5] The letter's definition states that total disability is the inability "to engage in any and every gainful occupation," whereas the Group Policy at issue here states that total disability is the inability "to perform for wage or profit, the material and substantial duties of any job."

-10-

your claim." There is no evidence that MBUSA informed Jajuga of the letter or sent him a copy. And there is no evidence that Prudential ever notified Jajuga directly that his claim had been denied.

It appears that Jajuga did not learn about the denial of his claim for waiver of premiums under the Group Policy until seven years after he had submitted it. On September 16, 2005, MBUSA sent a letter to Jajuga's attorney in response to the attorney's inquiry into Jajuga's life insurance coverage. MBUSA's letter stated that it had received a letter from Prudential dated November 29, 1999, denying the claim. A February 21, 2006, letter from MBUSA to Jajuga's attorney states that Prudential had recently informed MBUSA that it was unable to provide "a copy of any document which shows that Mr. Jajuga was informed by them of his premium waiver denial or of his rights to appeal" and that Prudential had "agreed to allow Mr. Jajuga to appeal their decision on his premium waiver claim." By this time, it was over eight and a half years after Jajuga had stopped working. MBUSA also stated that "Prudential has requested that they be provided with . . . [a] list of physicians . . . who have treated Mr. Jajuga since the inception of his illness" and that "Prudential has agreed to contact these physician[s] directly instead of having Mr. Jajuga request this information from them."

On March 17, 2006, Jajuga's attorney sent Prudential a list of Jajuga's past and current health care providers and five executed copies of "Authorization to Release Information" forms allowing Prudential to request Jajuga's medical records directly from his providers. Despite this undertaking by Prudential to get medical records directly, no additional information was added to the file about Jajuga's medical examinations and medical records from the period immediately after he left work.

On June 14, 2006, Prudential re-opened the claim, and on September 5, 2006, Prudential upheld its decision to deny the claim. The denial letter states that "the medical documentation in [the] file does not disclose findings of an impairment or combination of impairments so severe that they would result in the loss of all work capacity for a sedentary position." The denial letter does not mention Dr. Klein's attending physician statements of October 1997 and March 1998, nor does it mention the records of Jajuga's hospitalization in May and June of 1997.

Jajuga appealed this determination through his attorney on February 28, 2007. The attorney's letter stated that Jajuga had received both SSDI benefits and a waiver of premiums under Prudential's Individual Policy. The letter requested that Prudential provide Jajuga with copies of the evidence upon which Prudential based its determination that he was entitled to a waiver of premiums under the Individual Policy; copies of the evidence

-12-

upon which Prudential based its determination that he was not entitled to the waiver under the Group Policy; and the names, addresses, and professional qualifications of the persons who took part in determining that Jajuga was not entitled to the waiver under the Group Policy.

Prudential responded on April 17, 2007, stating that the disability definition in the Group Policy differed from that in the Individual Policy and the SSDI statute. Prudential also requested medical records for Jajuga's treatment from May 6, 1997 through March 1998. Prudential did not respond to Jajuga's requests for documents related to the granting of his waiver claim under the Individual Policy or for documents related to the denial of his waiver claim under the Group Policy. Jajuga's attorney responded to the request for medical records by reminding Prudential that Jajuga had already sent it a list of his past physicians and release authorization forms.

In reply, Prudential restated its request for medical records, and on October 12, 2007, Jajuga's attorney sent Prudential some medical records relating to Jajuga's treatment from 1998 forward and requested an additional thirty days to send along other medical records the attorney had requested. She also informed Prudential that she was not able to secure copies of all of Jajuga's medical records dating back to 1997 because some of his providers did not retain records for more than seven years. The

-13-

attorney stated that, by the time Jajuga was made aware in 2006 of the fact that Prudential had denied his claim and would allow him to appeal that decision, many of the relevant records had already been destroyed by the providers. One month later, she sent Prudential the records from Valley Hospital related to Jajuga's hospitalization in May and June of 1997 for detoxification and depression and stated she understood that Prudential was provided with all relevant medical records as part of Jajuga's claim for waivers of premiums under his Individual and Group Policies and that Prudential should still have those records, or at least claim reviewers' synopses of them, on file. No such records were ever provided to Jajuga save for the basic documents we described earlier.

On October 28, 2008, Prudential informed Jajuga that it had again affirmed its decision to deny his claim. This second denial letter does discuss the records of Jajuga's hospitalization in May 1997, but it again does not mention Dr. Klein's attending physician statements of October 1997 and March 1998.

This second assessment of the claim relied in part on a review of Jajuga's file performed in August 2008 by two outside physicians: a psychiatrist and a physical medicine and rehabilitation specialist. The psychiatrist, Dr. Lichtshein, concluded that Jajuga's history of alcohol abuse "in and of itself is not a disabling diagnosis" and that he did not "have depression

sufficient to warrant impairment." The physical medicine and rehabilitation specialist, Dr. Thampi, concluded that while "Mr. Jajuga does have evidence supportive of functional impairment from a physical medicine and rehabilitation perspective, as of the date 05/06/97 and forward," he nevertheless "does have the ability to sit through an eight-hour day, as long as he is given the opportunity to change positions approximately every one hour with a break for five minutes for standing as needed." Based on these reviews of the medical records available in 2008, Prudential concluded that as of May 6, 1997, Jajuga would have been able to perform the following jobs, based on his education and his history in retail and sales and in automotive service: telephone solicitor, automobile locator, customer-complaint clerk, and order taker.

Jajuga died on December 31, 2008, and the executor of his estate appealed again. Prudential denied this third appeal on August 24, 2009. The administrative record contains a supplemental review of Jajuga's file by Dr. Thampi, the physical medicine and rehabilitation specialist, dated August 3, 2009. This second review was based in part on medical records apparently not considered in the first review, including Dr. Klein's October 1997 and March 1998 attending physician statements. Dr. Thampi concluded that the new information did "not alter the prior assessment."

D.        Litigation

On January 20, 2010, the plaintiffs filed the present action in the district court pursuant to 29 U.S.C. § 1132(a), (e), and (f). Their complaint sought to recover life insurance benefits and enforce rights under the Group Policy. See Estate of Jajuga, 2011 WL 798162, at *1.

The case was referred to a magistrate judge for pretrial case management. The magistrate judge granted in part plaintiffs' motion to supplement the record and denied plaintiffs' motion seeking discovery. Estate of Jajuga v. Prudential Ins. Co. of Am., 742 F. Supp. 2d 176, 179 (D. Mass. 2010). In addition, the magistrate judge held that the district court would review de novo Prudential's decision to deny the claim. Id. at 182.

On cross-motions for summary judgment, the district court granted summary judgment for Prudential on March 1, 2011. Estate of Jajuga, 2011 WL 798162, at *4. Plaintiffs' timely appeal followed.

II.

A.        The standard of review

Our case law is clear that we review de novo the district court's decision to grant Prudential's cross-motion for summary judgment. Prudential argues that clear error review is required, but Prudential is simply wrong. Its argument rests on a misreading of Tsoulas v. Liberty Life Assurance Co. of Boston, 454 F.3d 69

-16-

(1st Cir. 2006). Tsoulas, unlike this case, was a case submitted on a stipulated record. Id. at 75 ("Our standard of review is governed by the fact that the parties submitted this case to the district court based on a stipulated record."); see García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643-44 (1st Cir. 2000). This is not a case submitted and the mere fact that the case was decided on summary judgment does not change the normal de novo standard of appellate review.

"We review a district court's grant of summary judgment de novo," including in ERISA benefit denial cases. Gent, 611 F.3d at 82; see also D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011) (reviewing de novo district court's grant of summary judgment in ERISA benefits denial case); Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010) (same), cert. denied, 131 S. Ct. 798 (2010); Wallace v. Johnson & Johnson, 585 F.3d 11, 14 (1st Cir. 2009) (same); Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 87 (1st Cir. 2008) (same); Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 516 (1st Cir. 2005) (same). Additionally, "in the ERISA benefit-denial context, where the record before us is the same record that was before the plan administrator . . . 'summary judgment is simply a vehicle for deciding the [benefits] issue' and 'the non-moving party is not entitled to the usual inferences in its favor.'" Gent, 611 F.3d at 82-83 (alteration in original) (quoting Orndorf, 404 F.3d at 517).

-17-

There is a separate question regarding what, if any, deference we give to the plan administrator's decision to deny benefits. The magistrate judge held that Prudential's denial of the claim would be reviewed de novo, and Prudential did not appeal from that decision, so any argument to the contrary is waived. In any event, we agree with the magistrate judge's ruling.[6] At all relevant times, Jajuga's Group Policy nowhere contained language granting Prudential as the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, so we review the administrative record de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Under de novo review, our task on appeal "is to independently weigh

---

[6] Under Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), a court reviews a plan administrator's denial of benefits de novo unless the benefits plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, id. at 115, in which case the denial is subject to a deferential "arbitrary and capricious" or "abuse of discretion" standard of review, Maher v. Mass. Gen. Hosp. Long Term Disability Plan, No. 10-1321, 2011 WL 6061347, at *2 (1st Cir. Dec. 7, 2011).

The magistrate judge concluded that de novo review applied here because "neither the plan nor any summary thereof contained discretionary language at the time Decedent enrolled in it on July 15, 1991, or when he stopped working on May 6, 1997, or when he requested that his life insurance premiums be waived on September 10, 1998," or when Prudential evidently made its original decision to deny the claim in November of 1999. Estate of Jajuga v. Prudential Ins. Co. of Am., 742 F. Supp. 2d 176, 180 (D. Mass. 2010). The magistrate judge acknowledged that certain plan documents were amended to give Prudential discretion in 2000, before the administrative appeals process began. Id. at 181. But the magistrate judge concluded that this post-decision amendment would not shift the standard of review from de novo to abuse of discretion. Id. at 181-82.

-18-

the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy.  We grant no deference to the administrators' opinions or conclusions."  Richards, 592 F.3d at 239.  Nor do we give any deference to the district court's view of the record, as our review on summary judgment is de novo.

B.        Jajuga's ability to work in May of 1997

In our view, the plaintiffs have carried their burden of showing that when Jajuga stopped working on May 6, 1997, he was "totally disabled" under the terms of the Group Policy.  That is, plaintiffs have sufficiently demonstrated that Jajuga was "not able to perform for wage or profit, the material and substantial duties of any job for which [he was] reasonably fitted by [his] education, training or experience."  The gaps in the record will not be read to benefit Prudential, which is primarily responsible for those gaps.

The two attending physician statements of Dr. Klein, a board certified neurologist, attest to Jajuga's total disability at the time he stopped working.  The form completed on October 13, 1997, in support of Jajuga's application for LTD benefits states that Jajuga was incapable of sedentary activity and was totally disabled for his own occupation and for any other work.  Dr. Klein's assessment was based on objective evidence: the MRI performed on May 13, 1997, about a week after Jajuga stopped

-19-

working. Neither the MRI films nor a first-hand account of the MRI results is in the administrative record, although Dr. Borowsky's second-hand description of the scan results is.

Dr. Klein's attending physician statement of March 30, 1998, in support of Jajuga's application for a waiver of premiums under the Group Policy similarly supports a finding of total disability. Dr. Klein stated on the form that Jajuga was unable to perform the duties of his job or any other job and that he could not work while under treatment because he could not sit. Dr. Klein's two attending physician statements are the only direct assessments of Jajuga's physical health during this period. Notably, none of Prudential's three denial letters produced during the administrative appeals process discusses Dr. Klein's attending physician statements.

On appeal, Prudential puts great weight on the only other piece of contemporaneous evidence in the administrative record: the record of Jajuga's hospitalization for detoxification and depression from May 24 to June 11, 1997. Prudential argues that Jajuga's hospitalization for detoxification on May 24, 1997, shows that he stopped working not because of disabling back pain but "to undergo treatment for alcoholism."

This is a brand new defense conjured up in litigation. At no point in the administrative appeals process did Prudential assert that Jajuga stopped working because of alcoholism rather

than back pain.  Of the three denial letters Prudential issued during the appeals process, only the second, dated October 28, 2008, even mentions his admission to the Valley Hospital for detoxification, and that denial letter states that Jajuga stopped working "due to back pain and depression."  Moreover, no evidence in the record -- including the Valley Hospital records and the reviews of the administrative record by the outside physicians retained by Prudential -- supports the assertion Prudential now makes that Jajuga stopped working due to alcoholism rather than back pain.

Prudential also relies on the report written by Dr. Semar upon Jajuga's discharge from the Valley Hospital on June 11, 1997.  Prudential argues that Dr. Semar's discharge plan constituted a medical evaluation of Jajuga's ability to return to work sufficient to overcome Dr. Klein's evaluations.  We disagree.  The discharge plan states: "[Jajuga] will continue with medical follow-up with Dr. Scham and return to work as soon as possible.  Diet will be regular.  Activities will be normal."  Dr. Semar was a psychiatrist, and the discharge summary is concerned with Jajuga's psychiatric health, not his physical health.  It is not even clear that this is a statement of Dr. Semar's opinion as opposed to a comment that the patient wished to return to work as soon as possible.  Even if Jajuga was psychiatrically able to "return to work as soon as possible," the report stated no opinion on whether

he was then <u>physically</u> able to perform the duties of his or any other job.

For the conclusion that Jajuga was totally disabled under the terms of the Group Policy, we also rely on the related decision by Prudential itself to grant Jajuga's claim for a waiver of premiums under his Individual Policy for being "totally disabled." It is undisputed that Prudential waived Jajuga's premiums under the Individual Policy and they continued to be waived until his death.[7] Prudential has no adequate explanation for this difference in treatment. We reject its argument that the eligibility standards in the Group Policy and the Individual Policy substantially differ.

The definition of "total disability" in the Group Policy is substantively indistinguishable from the definition of "totally disabled" in the Individual Policy. The Group Policy defines "total disability" as the inability "to perform for wage or profit, the material and substantial duties of any job." The Individual Policy's definition of "totally disabled" is the inability to "do any gainful work."

Prudential argues, and the district court agreed, that the Group Policy definition's "any job" is broader than the other definition's "any gainful work." We disagree and look to the entire definitions. If one is unable to "do any gainful work"

---

[7] Jajuga's premiums under the Individual Policy were waived by Prudential since at least 2000, but the administrative record is not clear as to exactly when Prudential granted the waiver.

(Individual Policy), one is also unable to "perform for wage or profit, the material and substantial duties of any job" (Group Policy). "Gainful" means "profitable" or "providing an income." Webster's Third New International Dictionary 928 (1993). It is not a reasonable reading of the policies that a person could be so disabled as to be unable to do "gainful" work but could still perform a job "for wage or profit." Indeed, ironically, Prudential's November 29, 1999, initial denial letter equated the two standards, referring to total disability under the Group Policy as an inability to engage in a "gainful occupation."

The determination of disability under the Individual Policy by Prudential itself is relevant evidence supporting the plaintiffs' claim that Jajuga was "totally disabled" on May 6, 1997, under the terms of the Group Policy.

That the Social Security Administration found Jajuga eligible for SSDI benefits is not conclusive but tends to support our conclusion. See Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 242 n.17 (1st Cir. 2006) (Although "a plan is not required to accept a Social Security adjudication of disability as binding on it where the definitions of disability are different[,] . . . that does not mean that the Social Security determination provides no relevant evidence."); cf. Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000). The administrative record shows that Jajuga was entitled to SSDI benefits beginning in

November 1997.  Because entitlement to benefits only begins after the lapse of a five-month "waiting period," during which the claimant must be disabled under the terms of the statute, the Social Security Administration evidently determined that Jajuga's disability began in May 1997.[8]  See 42 U.S.C. § 423(a)(1), (c)(2).  The SSDI statute defines disability as the inability to "engage in any . . . kind of substantial gainful work."  Id. § 423(d)(2).  The Group Policy itself refers to an inability to perform "the material and substantial duties of any job."

We turn to Prudential's argument that the paucity of relevant evidence from the period around Jajuga's last day of work is reason to hold that the plaintiffs have not carried their burden in this case.  That paucity is attributable to Prudential's failure to give Jajuga timely notice of its decision to deny his claim for a waiver of premiums under the Group Policy, as required by the

---

[8]  Prudential was aware from the first that Jajuga had been awarded SSDI benefits.  On the "employee's statement" portion of the Group Policy premium waiver claim form, Jajuga answered "yes" to the question "Have you been approved for Social Security Disability Benefits . . . ?"  He also stated that he had only applied for SSDI benefits once.  In addition, during the administrative appeals process, Jajuga's attorney informed Prudential of the award of SSDI benefits, the waiver of premiums under his Individual Policy, and the similarity of the relevant disability definitions to that of the Group Policy.

However, Prudential did not mention the award of SSDI benefits or the waiver of premiums under Jajuga's Individual Policy in any of the three denial letters it issued during the administrative appeals process.  Prudential only addressed the other definitions in a letter to Jajuga's attorney, in which Prudential concluded that the definitions were "not the same."

ERISA regulations. We reject the argument because Prudential should not benefit from its own misdeeds.

Under the ERISA regulations in effect at the time Jajuga made his claim, employee benefit plans had to "establish and maintain reasonable claims procedures." 29 C.F.R. § 2560.503-1(b) (1998).⁹ A claims procedure would be reasonable only if, among other things, notice of a decision to wholly or partially deny a claim was furnished to the claimant "within a reasonable period of time after receipt of the claim by the plan." Id. § 2560.503-1(e)(1); see also id. § 2560.503-1(b)(1)(I). These regulations state that a period of time beyond ninety days is per se unreasonable. Id. § 2560.503-1(e)(3). Here, MBUSA sent Jajuga's waiver of premiums claim to Prudential on September 10, 1998. However, Prudential evidently did not send any notification that it had denied the claim until November 29, 1999, over a year later, thus in violation of regulations.

Further, that notification was sent to MBUSA, not to Jajuga, the claimant, as was required by the regulations. See id. § 2560.503-1(f) ("A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice

_____

⁹ These notice regulations were promulgated under the authority of 29 U.S.C. § 1133, which states: "In accordance with regulations of the Secretary, every employee benefit plan shall-- (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant . . . ."

. . . ." (emphasis added)); id. § 2560.503-1(e)(1). There is no evidence whatsoever that Jajuga received notice of the denial of his Group Policy premium-waiver claim until September 2005. Indeed, his attorney had to pursue MBUSA to find out the status of the claim. This seven-year delay hindered Jajuga's (and after his death, the executor of his estate's) ability to gather proof of his disability in 1997, and matters were made worse by Prudential's evident failure to follow through on obtaining his medical records. After saying in early 2006 that it would obtain Jajuga's medical records directly from his past providers, Prudential evidently did not do so and has provided no evidence that it did. In April and August 2007, Prudential requested medical records from Jajuga while not responding to the statement of Jajuga's attorney that she understood that Prudential already had all of Jajuga's medical records and would request any it did not have from Jajuga's physicians directly.

Jajuga's attorney sought those records in mid-2007 from the providers, and in October 2007 she informed Prudential that she was not able to obtain copies of all of Jajuga's medical records dating back to 1997 because some of his providers did not retain records for more than seven years, so that by the time Jajuga was informed of the denial of his claim, those records had been destroyed. Had Jajuga been informed within ninety days of the denial of his September 1998 claim, the additional records of his

medical condition as of May 1997 would not have been routinely destroyed. We reject Prudential's unseemly argument that Jajuga's claim was insufficiently supported when Prudential's own failure to maintain reasonable claims procedures as required by the ERISA regulations made obtaining further supporting medical records impossible.[10]

To be sure, irregularities and non-compliance do not themselves automatically entitle the plaintiffs to the benefits they seek, and our result does not depend on Prudential's failure to comply with the law. See Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113, 130 n.13 (1st Cir. 2004); Terry v. Bayer Corp., 145 F.3d 28, 39 (1st Cir. 1998); 29 C.F.R. § 2560.503-1(e)(2) (1998) ("If notice of the denial of a claim is not furnished . . . within a reasonable period of time, the claim shall be deemed denied and the claimant shall be permitted to proceed to the review stage . . . ."). In Recupero v. New England Telephone & Telegraph Co., 118 F.3d 820 (1st Cir. 1997), we held that "allowing a claim for relief because of inadequacy of formal notice without any showing

_____

[10] The plaintiffs posit that Prudential may have had relevant medical records from 1997 in its file for Jajuga's claim for waiver of benefits under his Individual Policy. During the administrative appeals process, Jajuga's attorney requested copies of the evidence upon which Prudential based its determination that Jajuga was entitled to a waiver of premiums under his Individual Policy, but Prudential never acknowledged this request. Indeed, there is no evidence in the administrative record that Prudential ever looked into Jajuga's Individual Policy claim file to determine whether it contained any medical evidence pertinent to his Group Policy claim, and it has never asserted during this litigation that it did so.

-27-

that a precisely correct form of notice would have made a difference would result in benefit claims outcomes inconsistent with ERISA aims of providing secure funding of employee benefit plans." Id. at 840. Recupero dealt with notices of denial that were insufficient as a matter of law because they failed to include specific reasons why the claim was denied or to cite to any specific plan provisions upon which the denial was based. Id. at 825. We there concluded that the plaintiff had not shown that these procedural deficiencies had prejudiced her. Id. at 840. Here, however, for the reasons stated, plaintiffs have been prejudiced by Prudential's seven-year delay in giving Jajuga notice that his claim had been denied.

Nor does our conclusion that plaintiffs are entitled to benefits turn on invoking the equitable powers of federal courts in ERISA cases under 29 U.S.C. § 1132(a)(3). See Glista, 378 F.3d at 131.

We hold that, based on the relevant evidence in the administrative record, the Group Policy language, and the unexplained inconsistency in Prudential's award of benefits under the Individual Policy but denial of benefits under the Group Policy, Jajuga was "totally disabled" under the terms of the Group Policy when he stopped working on May 6, 1997. We do not need to reach the question of whether Prudential has also been arbitrary in its handling of Jajuga's claim.

III.

We reverse the grant of summary judgment in favor of Prudential and hold that the plaintiffs are entitled to judgment. We remand with instructions that an order be issued requiring Prudential to award benefits to the beneficiaries of Jajuga's Group Policy according to the terms of that policy, with any interest to which they may be entitled. Plaintiffs are awarded costs.