# United States Court of Appeals
## For the First Circuit

No. 16-1997

STEPHANIE C., Individually and as Guardian of M.G.,

Plaintiff, Appellant,

v.

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

Brian S. King, with whom Brian S. King, PC and Jonathan M. Feigenbaum were on brief, for appellant.
Joseph D. Halpern, with whom Law Office of Joseph Halpern and Donald J. Savery were on brief, for appellee.

March 24, 2017

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**.  In this case, brought pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), plaintiff-appellant Stephanie C. (Stephanie) continues to seek reimbursement for certain expenses connected with the treatment of her teenage son, M.G.  The plan administrator, defendant-appellee Blue Cross Blue Shield of Massachusetts HMO Blue, Inc. (BCBS), denied the portions of her claim that are now in dispute.  The district court, reviewing the denial de novo, upheld BCBS's action.  Stephanie appeals.  After careful consideration, we affirm.

## I.  BACKGROUND

This dispute is no stranger to our court: it comes before us for a second time.  See Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc. (Stephanie I), 813 F.3d 420 (1st Cir. 2016).  Because there is no need to repastinate ground already well-plowed, we begin by reproducing our earlier summary of how the case arose.

> Stephanie's son, M.G., is a derivative beneficiary of an ERISA-regulated group health insurance plan (the Plan) furnished by his father's employer, Harmonix Music Systems, Inc. (Harmonix).  The Plan is denominated as a "Preferred Blue PPO Preferred Provider Plan," the terms of which are set out in a subscriber certificate (the Certificate).  In pertinent part, the Certificate makes clear that coverage under the Plan remains subject to a determination of medical necessity made by BCBS.  It specifies that the Plan covers treatment for psychiatric illnesses, including biologically based conditions (e.g., autism) and, for children until age nineteen, for non-biologically based conditions (e.g., behavioral

- 2 -

problems).  Such benefits do not accrue for residential, custodial, or medically unnecessary services, such as those performed in "educational, vocational, or recreational settings."  The Certificate also stipulates that only the least intensive type of setting required for treatment of a condition will receive approval.  Any non-emergency inpatient course of treatment needs approval before the patient is admitted to the facility.

. . . .

M.G. experienced a number of mental health issues beginning in early childhood. . . .

M.G.'s condition intensified in severity in the summer of 2010 (the summer between his freshman and sophomore years in high school).  At that time, he became physically aggressive toward his parents and attended weekly mental health therapy sessions.  Although enrolled in an intensive outpatient educational facility, he continued to exhibit aggressive behavior that led to multiple arrests.  His problems escalated because he steadfastly refused to take medications despite a court order requiring him to do so.

Concerned about the apparent inadequacy of his care, Stephanie enrolled M.G. (at her own expense and without prior approval) in Vantage Point by Aspiro (Aspiro), a wilderness therapy program based in Utah, which specializes in neurodevelopmental disorders.  M.G. remained at Aspiro from October of 2010 to January of 2011.  His psychological evaluators there diagnosed him as having Asperger's Syndrome, anxiety disorder, and attention deficit and hyperactivity disorder.  Noticing some improvement, they recommended that he continue therapy in a longer-term setting.

On the advice of a consultant and without prior approval, Stephanie proceeded to enroll M.G. in Gateway Academy (Gateway), a private school treatment center in Utah that BCBS insists is "out of network" (that is, not in a contractual relationship with BCBS).  While at Gateway, M.G.'s aggressive and emotionally erratic behavior continued; among other things, he engaged in inappropriate sexual contact and committed a variety of petty criminal offenses.

In April of 2011, Harmonix submitted claims to BCBS for three sets of psychiatric evaluations and consultation services (performed during the period from January 27, 2011 to February 23, 2011) in connection with M.G.'s admission to Gateway.  In late June, BCBS informed Harmonix that Gateway was a non-covered

provider but that it would cover the three sets of evaluations "as a one-time exception." Gateway itself submitted claims in September of 2011 and March of 2012 seeking reimbursement for principally residential services rendered to M.G. dating back to January of 2011.

In an informal process, BCBS denied these room and board claims because the services were not medically necessary and the submitted documentation did not support the need for an inpatient admission. In an explanatory letter dated May 25, 2012, BCBS advised M.G.'s father that its denial of benefits was based largely upon an evaluation conducted by Dr. Elyce Kearns, a psychiatrist-reviewer, who relied upon "InterQual," a nationally recognized set of criteria used to assess the level of care for mental health patients. Given Dr. Kearns' evaluation, BCBS concluded that M.G.'s "clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay."

About a year later, Stephanie requested and received a sheaf of pertinent records from BCBS. She then contested the denial of coverage through BCBS's internal review process. In support of her appeal, Stephanie furnished documentation from M.G.'s psychotherapists, evaluators, and educators in addition to police reports and juvenile court records. Collectively, these materials described M.G.'s difficulties involving physical and verbal aggression, emotional volatility, lack of impulse control, and thinking errors. This pattern of conduct, Stephanie maintained, posed a danger to M.G. and to others.

A second psychiatrist-reviewer, Dr. Kerim Munir, scrutinized the administrative record and recommended that BCBS uphold the denial of benefits. He cited the absence of any medical necessity for the placement and reiterated the conclusions of the first psychiatrist-reviewer. On June 19, 2013, BCBS denied the internal appeal in a letter to Stephanie.

Id. at 423-25 (footnote omitted).

Having exhausted her administrative remedies, Stephanie sued BCBS in an effort to recover the denied benefits. See 29 U.S.C. § 1132(a)(1)(B). The parties cross-moved for summary

- 4 -

judgment, and the district court entered judgment in favor of BCBS. See Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., No. 13-13250, 2015 WL 1443012, at *12 (D. Mass. Mar. 29, 2015). Stephanie appealed.

We did not reach the merits of Stephanie's appeal but, rather, focused on a threshold issue, holding that the district court erred in reviewing BCBS's denial of benefits for abuse of discretion. See Stephanie I, 813 F.3d at 428-29. We explained that the court should have reviewed the denial de novo because the Certificate did not unambiguously confer discretionary decisionmaking authority on the plan administrator (BCBS). See id. (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (holding that a denial of ERISA benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan")). Consequently, we vacated the district court's decision in relevant part and remanded for reappraisal of the denial of benefits under the appropriate standard of review. See id. at 429.

On remand, the district court — this time exercising de novo review — again entered judgment in favor of BCBS. See Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.

(Stephanie II), No. 13-13250, 2016 WL 3636978, at *4 (D. Mass. June 30, 2016). This timely appeal followed.

## II. STANDARD OF APPELLATE REVIEW

This appeal, like Stephanie's earlier appeal, presents a standard of review quandary — but one that operates on a different level. The first time around, we were asked to determine what standard of review the district court should employ in its review of the record of proceedings before the plan administrator. See Stephanie I, 813 F.3d at 428-29. On remand, the district court performed that task and, as we had instructed, exercised de novo review. See Stephanie II, 2016 WL 3636978, at *4. The question now becomes what standard we should apply in reviewing the district court's decision.

Stephanie posits that we should undertake de novo review at the appellate level. Her argument leans heavily on the fact that the parties presented this case to the district court on cross-motions for summary judgment. This argument has a certain superficial appeal: after all, appellate review of a district court's grant or denial of summary judgment is normally de novo, see, e.g., Murray v. Kindred Nursing Ctrs. W. LLC, 789 F.3d 20, 25 (1st Cir. 2015); Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999), and that standard is not altered by the incidence of cross-motions for summary judgment, see, e.g., Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).

The rationale behind this practice is straightforward. In the ordinary case, a motion for summary judgment asks the district court to decide questions of law: does the summary judgment record, viewed in the light most hospitable to the nonmovant, reveal the absence of any genuine issue of material fact and confirm that the movant is entitled to judgment as a matter of law? See Fed. R. Civ. P. 56(a); Murray, 789 F.3d at 25. If the answers to these questions are in the affirmative, the case ends; if the answers are in the negative, the case is set for trial.

But one size does not fit all. As we previously have noted, a motion for summary judgment has a different office in administrative law cases. There, a summary judgment motion "is simply a vehicle to tee up a case for judicial review" based on the administrative record. Bos. Redev. Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). "That the parties brought the issues forward on cross-motions for summary judgment is not significant; substance must prevail over form . . . ." S. Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 97-98 (1st Cir. 2002). The controlling feature is that the parties have presented the case to the court for an up-or-down decision on the administrative record, see id., and judicial decisionmaking proceeds on that basis.

"ERISA benefit-denial cases typically are adjudicated on the record compiled before the plan administrator." Denmark v.

Liberty Life Assur. Co., 566 F.3d 1, 10 (1st Cir. 2009).  Such cases bear a strong family resemblance to administrative law cases.[1]  Thus — as in the administrative law context — a motion for summary judgment is simply a mechanism for positioning an ERISA benefit-denial case for a district court's decision on the record of proceedings before the plan administrator.  See Bard v. Bos. Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (explaining that "[i]n the ERISA context, summary judgment is merely a vehicle for deciding the case").

Stephanie tries to avoid the force of this analogy by relying on our decision in Sánchez-Rodríguez v. AT & T Mobility Puerto Rico, Inc. for the proposition that the intent of the parties at the time they moved for summary judgment ought to govern the standard of appellate review.  See 673 F.3d 1, 11 (1st Cir. 2012).  Sánchez-Rodríguez, though, is a horse of an appreciably different hue.  That case did not involve anything resembling an

---

[1] We limit our discussion to those ERISA benefit-denial cases that are decided solely on the record of proceedings before the plan administrator and without additional evidence being taken in the district court.  We recognize, though, that the record in an ERISA benefit-denial case may be expanded for "good reason." Denmark, 566 F.3d at 10; see Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 520 (1st Cir. 2005) (noting that outside evidence may be relevant when a beneficiary challenges the procedure used to deny benefits or claims a plan administrator acted unfairly because of personal bias); Leahy v. Raytheon Co., 315 F.3d 11, 18 n.6 (1st Cir. 2002) (leaving open "possibility that, in special circumstances, a district court might take evidence in an ERISA case").  This is not such a case: here, neither party sought to expand the record.

administrative record; it was, instead, a garden-variety employment discrimination suit in which the parties had filed cross-motions for summary judgment. See id. at 4. The district court assumed the case to be a "case stated," that is, a case in which "the parties waive trial and present the case to the court on the undisputed facts in the pre-trial record." Id. at 10-11 (quoting TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007)). We found the "case stated" characterization inappropos (even though the parties had agreed on some facts); held that the district court should not have decided the summary judgment motions on a case stated basis; and affirmed on other grounds. See id. at 11, 16. Placed in its proper perspective, Sánchez-Rodríguez is not instructive here.

Our rejection of Stephanie's two principal arguments does not answer the question of what standard of review an appellate court must apply in an ERISA benefit-denial case that is presented for decision exclusively on the record of proceedings before the plan administrator. BCBS suggests an answer to this question. It posits that we should review the district court's decision, to the extent that it rests upon factual findings and inferences therefrom, only for clear error.[2]

---

[2] De novo review differs significantly from clear error review. Compare Leahy v. Raytheon Co., 315 F.3d 11, 16 (1st Cir. 2002) (stating that, under de novo review, "the court of appeals must decide [the relevant issues] for itself"), and United States

Logically, the nature of the district court's review ought to figure importantly in determining the appropriate standard of appellate review. Where the ERISA plan grants the plan administrator discretionary authority, the district court must uphold that decision unless it is arbitrary, capricious, or an abuse of discretion. See D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011). In that event, it makes sense that appellate review should be de novo. See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disab. Plan, 705 F.3d 58, 61 n.2 (1st Cir. 2013) (reviewing de novo district court's determination that plan administrator had abused its discretion and explaining that "[w]here applicable, the abuse of discretion standard binds all reviewing courts, whether district or appellate, in the evaluation of a plan administrator's determinations").

On the other hand, where the district court reviews the record of proceedings before the plan administrator de novo, the court may weigh the facts, resolve conflicts in the evidence, and draw reasonable inferences. See Orndorf v. Paul Revere Life Ins.

---

v. Howard (In re Extradition of Howard), 996 F.2d 1320, 1327 (1st Cir. 1993) (explaining that de novo review affords no deference to the lower court), with Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990) (describing clear error standard and stating that "we ought not to upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made").

Co., 404 F.3d 510, 518 (1st Cir. 2005). In such cases, the argument for a more deferential standard of review has at least a patina of plausibility.[3] Cf. Dantran, Inc. v. U.S. Dep't of Labor, 171 F.3d 58, 71 (1st Cir. 1999) (explaining that "courts regularly review factfinding done pursuant to a preponderance of the evidence standard for clear error").

To complicate matters, our case law, specific to the ERISA context, appears murky. In Tsoulas v. Liberty Life Assurance Co., the claimant alleged that her long-term disability benefits had been wrongfully terminated. See 454 F.3d 69, 72 (1st Cir. 2006). The district court, exercising de novo review, entered judgment for the fiduciary. See id. Noting that "the parties submitted this case to the district court based on a stipulated

---

[3] That district courts typically decide certain types of administrative cases "without live testimony, on the basis of the administrative record, does not detract from the wisdom of clear-error review." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 990 (1st Cir. 1990). In the last analysis, "findings of fact do not forfeit 'clearly erroneous' deference merely because they stem from a paper record." RCI Ne. Servs. Div. v. Bos. Edison Co., 822 F.2d 199, 202 (1st Cir. 1987); see, e.g., Limone v. United States, 579 F.3d 79, 94 (1st Cir. 2009) ("The application of clear-error review to findings drawn from a paper record has long been the practice in this circuit."); Brandt v. Repco Printers & Litho., Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 108 (1st Cir. 1997) ("[A] bankruptcy court's factual findings are entitled to the deference inherent in clear-error review even when they do not implicate live testimony, but, rather, evolve entirely from a paper record that is equally available to the reviewing court."); see also Hess v. Hartford Life & Acc. Ins. Co., 274 F.3d 456, 461 (7th Cir. 2001) (analogizing submission of case on administrative record to a bench trial and reviewing for clear error).

- 11 -

record" of the proceedings before the plan administrator, we held that the court's factual determinations were reviewable for clear error. Id. at 75-76; accord DiGregorio v. Hartford Comp've Emp. Ben. Serv. Co., 423 F.3d 6, 13 (1st Cir. 2005) (reviewing factual conclusion drawn by district court from record of proceedings for clear error).

In Orndorf, though, we exercised plenary review over a district court's de novo review of a plan administrator's benefit-denial decision and questioned whether factfinding has any place in the typical ERISA case. See 404 F.3d at 516-18. We suggested that "[w]here review is properly confined to the administrative record before the ERISA plan administrator, . . . there are no disputed issues of fact for the court to resolve." Id. at 518.

While we regard this dive into the case law as informative, we need not resolve the tension in our decisions. Standards of review sometimes have decretory significance — but sometimes they do not. In the last analysis, this case falls into the latter camp: we have examined the record with care, and we are satisfied that, regardless of whether we review the district court's decision de novo or (more deferentially) for clear error, the outcome would be the same. Accordingly, we leave the standard of appellate review question open; assume, favorably to Stephanie, that our review is de novo; and proceed on that assumption.

## III.  THE MERITS

The district court concluded that BCBS was justified in denying coverage for M.G.'s expenses at Gateway for two independently sufficient reasons.  First, the court held that the Plan does not provide coverage for services rendered in an educational setting.  See Stephanie II, 2016 WL 3636978, at *2. Second, the court held that, in all events, the services in question were not medically necessary within the purview of the Plan.  See id. at *3.  An overarching principle applies to both aspects of the district court's decision: an ERISA beneficiary who claims the wrongful denial of benefits bears the burden of demonstrating, by a preponderance of the evidence, that she was in fact entitled to coverage.  See Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 83 (1st Cir. 2010).

This case is fact-intensive, and it would serve no useful purpose for us to mine the record extravagantly.  For present purposes, we think it sufficient to explain briefly why we conclude — as did the district court — that Stephanie, although well-represented by able counsel, failed to carry her burden on either of the two identified grounds.

Our starting point is the Certificate itself, which makes pellucid that no benefits are provided for "services that are performed in educational . . . settings."  It goes on to describe such settings:

- 13 -

[t]hese programs may have educational accreditation. The staff may include some licensed mental health providers who may provide some therapy. No benefits are provided for any services furnished along with one of these non-covered programs. For example, no benefits are provided for therapy and/or psychotherapy furnished along with one of these non-covered programs.

The district court concluded, accordingly, that Gateway was an "educational setting," Stephanie II, 2016 WL 3636978, at *2, and Stephanie does not offer an alternative reading of the Certificate that would square its exclusion of services rendered in educational settings with the coverage she seeks. She also does not contest that Gateway provided some educational services; that regular course work is a part of the program; that Gateway refers to its enrollees as "students"; and that the enrollees attend scholastic classes and receive traditional letter grades and grade-point averages. Nor does she dispute that Gateway refers to its facility as a "campus" or that when an enrollee completes the Gateway program, he is said to have "graduated." Given these uncontested facts, it is nose-on-the-face plain that Gateway is an "educational setting." Stephanie resists this conclusion, arguing that the educational setting exclusion should not apply because education was not the "substantive purpose" for M.G.'s enrollment. The terms of the Certificate, though, do not admit of any such distinction. Rather, those terms state, with conspicuous clarity, that "[n]o benefits are provided for any services furnished along with one of these non-covered [educational] programs."

Stephanie has a fallback position. She contends that BCBS did not properly notify her that Gateway's educational setting constituted a reason for its denial of benefits. The underlying premise on which this contention rests is sound: a plan administrator, in terminating or denying benefits, may not rely on a theory for its termination or denial that it did not communicate to the insured prior to litigation. See Bard, 471 F.3d at 244; Glista v. Unum Life Ins. Co., 378 F.3d 113, 128-32 (1st Cir. 2004). Here, however, the conclusion that Stephanie draws from this premise is problematic. She concedes that, well before the commencement of any litigation, BCBS notified M.G.'s father (the holder of the Certificate and, thus, the subscriber) of the educational setting issue in a telephone call.

The Certificate provides that, if a claim is denied, BCBS "will send you and/or the health care provider" notice of the reason for the denial. The pronoun "you" is defined as "any member who has the right to the coverage provided by this health plan. A member may be the subscriber or his or her enrolled eligible spouse (or former spouse, if applicable) or any other enrolled eligible dependent."[4] To cinch matters, M.G.'s father was designated as an addressee for correspondence regarding M.G.'s claims.

_____

[4] In all instances, emphasis in the Certificate's language is its own.

- 15 -

Stephanie does not dispute that M.G.'s father was a proper recipient for such notices. She nonetheless rejoins that the educational setting message needed to be communicated in writing. See 29 U.S.C. § 1133(1) (requiring plan administrators to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant"); see also 29 C.F.R. § 2560.503-1(g)(1) ("[T]he plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination."). On that basis, she asserts that we should disregard the telephone call to M.G.'s father.

But there is a rub: Stephanie did not argue to the district court that the notice she received of the educational setting ground for denial was defective because it was not in writing. She focused, instead, on whether BCBS had notified her at all of the educational setting issue during the internal appeals process. She cannot now switch horses mid-stream in search of a swifter steed. See Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). As a result, we hold, as did the court below, that

- 16 -

the educational setting bar to coverage, adumbrated in the Certificate, justified BCBS's denial of Stephanie's claim.[5]

Even though this holding is dispositive of Stephanie's claim, we address succinctly, for the sake of completeness, the district court's second ground for denying the claim: that M.G.'s stay at Gateway was not shown to be medically necessary. The court based this holding on a finding that M.G.'s treatment did not satisfy the InterQual criteria for adolescent psychiatry, as implemented by BCBS's internal policies. See Stephanie II, 2016 WL 3636978, at *3.

The Certificate dictates that BCBS "decides which health care services . . . are medically necessary and appropriate for coverage." Of course, on de novo review, we must be satisfied the plan administrator's decision is correct. See Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010). Indeed, even under deferential review, the determination must be reasonable. See Colby, 705 F.3d at 62.

_____

[5] BCBS submits that, in all events, it provided notice of the educational setting bar in writing through M.G.'s "Claims Listing," which catalogues Explanation of Benefits letters (EOBs) sent to Stephanie. One such EOB (for an out-of-state psychiatric consultation) listed the educational setting explanation. Because we hold that the telephone call with M.G.'s father constituted sufficient notice in the circumstances of this case, we take no view as to whether the EOB, standing alone, would have constituted sufficient notice.

To facilitate this decisionmaking, BCBS reviewers reasonably consult the InterQual criteria, which are nationally recognized, third-party guidelines. The criteria provide a sensible structure for analyzing a patient's particular symptoms, diagnoses, risks, and circumstances to determine what level of care is medically necessary.

As relevant here, the InterQual criteria invite a three-part analysis. First, the reviewer must analyze the patient's clinical indications, that is, his current psychiatric diagnosis and symptoms. If the clinical indications suggest a need for further treatment, the reviewer must then consider the individual's social risks. That consideration entails an examination of the remaining two parts of the algorithm: risks and level of care, respectively.

The district court did not make specific findings regarding M.G.'s clinical indications, and the logical inference is that the court deemed Stephanie's proof on this point sufficient. Although BCBS claims that M.G.'s symptoms did not satisfy the listed criteria because he was not a chronic or persistent danger to himself or others within the week prior to his admission at Gateway as required by the InterQual criteria, the record belies this claim.

Under the InterQual criteria, an individual is a chronic or persistent danger to himself or others if he exhibits any one

of several enumerated behaviors.  One such enumerated behavior is unmanageable "[a]ngry outbursts / [a]ggression."  Another is "[s]exually inappropriate / aggressive / abusive" conduct, which (according to the notes accompanying the InterQual criteria) may include "noncontact acts" such as "sexual comments."

We need not tarry.  On this issue, it suffices to say that records from M.G.'s final week in the wilderness program describe M.G.'s continued struggle with his emotions.  He would quickly become agitated with members of his cohort and curse at them, using "excessive inappropriate language including insults and perverted statements."  M.G.'s years-long pattern of outbursts and the prognosis formulated by his therapist at the wilderness program offer every indication that M.G.'s aggressive and inappropriate sexual comments will continue.  Given this tableau, we believe that Stephanie carried her burden of showing that M.G. displayed clinical indications adequate to satisfy the InterQual criteria.

Stephanie's proof does not fare as well on the remaining parts of the tripartite analysis.  Under the InterQual criteria, Stephanie was required to show that M.G. had a record of unsuccessful treatment within the year prior to his admission to Gateway and that he was unable to be managed at a lower level of care (that is, a level of care less intensive than the Gateway program).  The district court concluded that Stephanie had not

satisfied either of these requirements.  See Stephanie II, 2016 WL 3636978, at *3.  On de novo review, we reach the same conclusion.

To begin, the record leaves no doubt that M.G. did not have a record of unsuccessful treatment within a year prior to his admission at Gateway.  Prior courses of treatments, such as the wilderness program, undeniably improved M.G.'s symptoms.  See id.

A few examples hammer home the point.  M.G.'s discharge report from the wilderness program confirmed that, after finishing the program, he had a greater ability to express his emotions, problem solve, and deal with frustration and disappointment.  So, too, the discharge summary disclosed that M.G. had "reduced his inappropriate talk and impulsive behaviors."  These are badges of improvement, signifying that the wilderness program achieved at least a modicum of success.

Arguing to the contrary, Stephanie relies on the recommendation of a therapist at the wilderness program for ongoing residential treatment of M.G.  The notes accompanying the InterQual criteria, though, define unsuccessful treatment as a "lack of improvement of a patient's symptoms and behaviors in previous treatment" or "inability to complete an adequate trial of treatment provided by a licensed program or clinician."  Under this standard, the fact that M.G. required further treatment did not mean that the previous treatment was unsuccessful; what matters is that M.G. did not exhibit the requisite "lack of improvement" needed to

render his prior treatment unsuccessful. Stephanie does not explain how we can reconcile M.G.'s apparent improvement with the InterQual criteria's definition of unsuccessful treatment.

Stephanie offers a second reason why M.G. should be regarded as having a history of unsuccessful treatment within the year prior to commencing the Gateway program. She notes that M.G. began an outpatient regime in August of 2010 and that he was arrested the following month for hitting her. While this incident does seem to present an example of failed treatment in the relevant time frame, M.G.'s subsequent progress in the wilderness program strongly suggests that he was able to be managed at a lower level of care, the second requirement under the InterQual definition of "[t]reatment." Given M.G.'s improving symptomatology immediately prior to his Gateway admission, we are not persuaded that Stephanie has carried her burden of demonstrating that M.G. had the required record of unsuccessful treatment.

Similarly, we agree with the district court, see id., that Stephanie's proof fell short in yet another respect: M.G. had neither been discharged nor transferred from psychiatric hospitalization within twenty-four hours prior to his admission to Gateway. The twenty-four-hour discharge or transfer requirement is listed under the "Psychiatric Subacute Care" treatment setting. Stephanie argues that it was not necessary for M.G. to satisfy this requirement. In her view, the district court should have

applied the less onerous standards specified for a "Psychiatric Residential Treatment Center" setting. We do not agree.

Stephanie's argument hits a snag because the Certificate states that BCBS "decides which health care services . . . are medically necessary and appropriate for coverage." To perform this analysis, BCBS looks to the InterQual criteria. Those criteria, in turn, state that "[i]n making a level of care determination, . . . contractual agreements may be considered based on organizational policy." The descriptions for the "Psychiatric Subacute Care" and "Psychiatric Residential Treatment Center" settings also state that they are "subject to organizational policy."

The record is uncontradicted that BCBS had in place an organizational policy of exclusively using the psychiatric subacute care level of care criteria for adolescent acute residential treatment. Reading the InterQual criteria as a whole, this policy of using the psychiatric subacute care level of care criteria was reasonable and trumps any references to other care settings.

In an effort to undermine this conclusion, Stephanie suggests that the term "organizational policy," as used in the InterQual criteria, refers to the organizational policies of service providers, not to any organizational policy of BCBS. This suggestion contains more cry than wool. Although the term

"organizational policy" is undefined, one use of it is in the directions for InterQual's adolescent psychiatry criteria. These instructions explain that the level of care determination itself may be informed by "organizational policy." The most logical reading of the instructions is that the term refers to the policies of the party or organization charged with making the level of care determination (here, BCBS). Logically, then, the term "organizational policy" has the same meaning three pages later when the InterQual criteria are describing various treatment settings. Cf. Gustafson v. Alloyd Co., 513 U.S. 561, 568 (1995) (explaining that "our duty to construe statutes, not isolated provisions," dictates that a "term should be construed, if possible, to give it a consistent meaning throughout" a statute); Smart v. Gillette Co. Long-Term Disab. Plan, 70 F.3d 173, 179 (1st Cir. 1995) ("Accepted canons of construction forbid the balkanization of contracts for interpretive purposes."). We conclude, therefore, that the term "organizational policy," as used in the InterQual criteria, refers in this context to BCBS's organizational policy.

We add, moreover, that the record reflects no basis for finding BCBS's organizational policy unreasonable. The Certificate itself supports BCBS on this point. It provides coverage for inpatient, outpatient, and intermediate mental health care services for adolescents. Intermediate services — services

somewhere between traditional inpatient and outpatient care — include "acute residential treatment," "partial hospital programs," and "intensive outpatient programs."

BCBS posits that the InterQual criteria's "Psychiatric Subacute Care" level of care corresponds with the "acute residential treatment" referenced in the Certificate.[6]  Given the residential nature of Gateway and that it is not a "partial hospital program" or an "outpatient" program, we agree that BCBS's decision to follow its internal policy was reasonable.  And because the policy controls in this instance, BCBS acted appropriately in analyzing Gateway as a psychiatric subacute care treatment setting.  Consequently, Stephanie had the burden of showing that M.G. had either been discharged or transferred from psychiatric hospitalization within twenty-four hours prior to his Gateway admission.  She offered no evidence to satisfy this burden.  Hence, we conclude — as did the district court, see Stephanie II, 2016 WL 3636978, at *3 — that Stephanie failed to prove that Gateway's services were medically necessary for M.G.'s care.

---

[6] The parties tussle over the meaning of "acute" versus "subacute."  BCBS asserts that the words are used interchangeably in the health insurance industry.  Stephanie insists that "subacute," by definition, means less than "acute."  But assuming, favorably to Stephanie, that "subacute" indicates a less intensive level of care in this instance, the BCBS's organizational policy of using the "Psychiatric Subacute Care" criteria would result in it employing a less stringent standard than required by the Plan, which covers "acute residential treatment."

- 24 -

To sum up, an ERISA plan is a form of contract. See Firestone, 489 U.S. at 112-13. Thus, contract-law principles inform the construction of an ERISA plan, and the plain language of the plan provisions should normally be given effect. See Filiatrault v. Comverse Tech., Inc., 275 F.3d 131, 135 (1st Cir. 2001). Seen in this light, the dispositive issue here is not whether M.G.'s course of treatment at Gateway was beneficial to him but, rather, whether that course of treatment was covered under the Plan. Applying the plain language of the Plan, we hold that the clear weight of the evidence dictates a finding that the disputed charges were not medically necessary (as defined by the Plan) and, thus, were not covered.

## IV. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**